**FILED**

NOV 1 7 2009

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**ROBERT L. COGAR,**
        **Plaintiff,**

v.                                **CIVIL ACTION NO. 2:08cv124**
                                **(Judge Maxwell)**

**MICHAEL J. ASTRUE, COMMISSIONER OF**
**SOCIAL SECURITY,**
        **Defendant**.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain

judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross

Motions for Summary Judgment and has been referred to the undersigned United States Magistrate

Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

### I. Procedural History

Robert L. Cogar ("Plaintiff") filed his application for DIB on September 16, 2005, alleging

disability as of August 22, 2005, due to back, hip, and leg pain due to a work injury (122). His

claim was denied at the Initial and Reconsideration levels (R. 30, 49). Plaintiff requested a hearing,

which Administrative Law Judge ("ALJ") Thomas King held on June 13, 2007 (R. 525). Plaintiff,

represented by counsel, testified along with Vocational Expert Robert Jackson ("VE"). The ALJ

rendered a decision on July 19, 2007, finding that Plaintiff was not under a "disability," as defined

in the Social Security Act, at any time through the date of the decision (R. 17-29). Plaintiff

submitted additional evidence and requested review of the decision, which the Appeals Council

declined (R. 5-7), making the ALJ's decision the final decision of the Commissioner. Plaintiff then timely filed his appeal with this Court.

## II. Statement of Facts

Plaintiff was 36 years old at the time of the ALJ's decision and is considered a "younger individual" under 20 CFR 404.1563 (R. 530). He has a high school education and most recently worked as a fork lift operator from 2002 to 2005 (R. 103).

On September 8, 1990 (age 20), Plaintiff was admitted to the hospital due to a truck accident (R. 183). He had a head injury as well as injuries to his right hand. He was diagnosed with concussion with severe laceration of the scalp and a nasal bone fracture. He was discharged two days later.

On December 9, 2002, Plaintiff complained of hip and back pain for three weeks (R. 337).

An MRI dated January 4, 2003 (age 32–three years prior to alleged onset date) found disc herniations centrally at L3-L4, L4-L5, and L5-S1, with slight right sided predominance at L4-L5; degenerative disc disease at all the above levels; and a slight herniation at L4-L5 "which may truly represent disc protrusion. It at least effects the above three levels." (R. 196). Additionally, the lumbar spine demonstrated straightening of the normal lumbar lordotic curve and dextroscoliosis (R. 195).

On January 23, 2003, Plaintiff presented to neurologist Robert J. Crow for his low back and leg pain (R. 259). Plaintiff reported a history of chronic back pain since approximately 1992, when he was in an automobile accident while on a hunting trip. He developed back pain after stepping in a pot hole and also some right leg pain. Since that time he had had complaints of back pain; numbness in both legs and tingling in both feet. His right leg gave way sometimes. The pain was

always there. He rated it on a scale of 7/10. Standing, bending, and lifting made it worse. He was treated with heat compressors, pain medications, and muscle relaxants. He was referred to Dr. Crow by Dr. Mace, his treating physician. Plaintiff reported fatigue, frequent headaches, numbness, tingling, increased frequency, joint pain, weakness, and decreased range of motion.

Neurological examination showed Plaintiff was well developed, alert and oriented, and in no acute distress. He was comfortable. His gait was normal with excellent heel and toe walking. Range of motion of the low back was normal There was no midline percussible pain, no trigger point or spasm. Straight leg raise and cross straight leg raise were negative. Motor exam was intact and symmetrical as were sensory exam and deep tendon reflexes.

Dr. Crow noted that MRI revealed multiple level degenerative disc disease with some minimal spinal canal narrowing but no obvious nerve root compression. He recommended physical therapy for about a month and evaluation by a pain clinic.

On August 4, 2004, Plaintiff presented to a physician's assistant for complaints of low back and right hip pain (R. 333). Plaintiff reported an "old injury," but that this pain just started the day before, and was so bad he could not work.

On August 20, 2004, Plaintiff reported continued back pain (R. 331).

On August 23, 2004, Plaintiff underwent a lumbar spine and bilateral hip x-ray which showed straightening of the lumbar spine most likely due to muscle spasm or positioning, and no abnormal pathology at pelvis or hips (R. 325).

An MRI dated August 27, 2004 (age 34–one year prior to alleged onset date) showed disc herniation at L5-S1 on the right side; right sided disc protrusion at L4-5; degenerative disc disease; and straightening of the normal lumbar lordotic curve (R. 194). It was later noted that the findings

at L4-5 and L5-S1 were similar to the earlier MRI; however, the findings at L3-4 had improved since the prior study (R. 483).

On September 1, 2004, Plaintiff followed up with Dr. Mace regarding his MRI results (R. 330). He was diagnosed with acute lumbar muscle spasm and degenerative disc disease of the lumbar spine, and was referred to a neurologist.

On January 27, 2005, Plaintiff presented to his doctor with complaints of his right leg giving out for the past 4-5 days (R. 329). It was noted no appointment with a specialist had yet been made.

On February 25, 2005, neurologist Dr. Weinstein wrote to Dr. Mace, stating that Plaintiff was a 34-year-old fork lift operator who had "had back troubles for a long time." (R. 232). He noted that Plaintiff was now troubled with low back symptoms and pain and numbness going into the right leg. Dr. Weinstein noted that on examination he did not find "too much." Ankle jerks were intact; there was no peripheral weakness; and straight leg raising was only positive at about 70-80 degrees. He reviewed the MRI, but believed instead of a disc herniation at 5-1, it showed a central bulge. He opined it could be worse since August, however. Dr. Weinstein advised conservative treatment, but recommended another MRI, because "there is no question that things might be different in his back that [sic] is represented on the MRI from the last one."

On August 2, 2005, Plaintiff presented to Dr. Mace with complaints of back pain (R. 327). He had a history of back pain for many years, and said he had degenerative disc disease. He walked protecting his back, and supported his body with his arms when sitting. He changed position with difficulty. His pain became worse the previous day after bending over. 800 mg Motrin was not helping his pain. The diagnosis was acute lumbar muscle spasm and degenerative disc disease of the lumbar spine.

One week later, Plaintiff reported he was doing "some better" (R. 326).

On August 22, 2005, Plaintiff presented to the ER stating he was lifting at work, when his hip or low back "popped" (R. 324). His lower back hurt as well as his left side hurt down to the knee He took a hydrocodone at work, but felt like "something is out." He appeared "quite uncomfortable." X-rays showed no fracture or dislocation. There was left sided low back and hip tenderness. He was diagnosed with lumbar strain and given Demerol. He was also to "resume" hydrocodone and flexeril and was recommended he be off work for one week.

An MRI dated August 30, 2005 indicated a small right paracentral disc protrusion at L4-5; posterocentral disc protrusion at L5-S1; and disc dessication at L3-4, L4-5, and L5-S1 (R. 188).

On September 4, 2005, Plaintiff was seen at the emergency room for follow-up of lower back pain radiating to his left hip and leg to the ankle (R. 208). The back pain was due to a back injury caused when lifting a pallet at work. Plaintiff said the pain was much better than during his first clinic visit on August 22, but that he still had pain radiating down his leg. He was unable to lift at home. Plaintiff was discharged with a prescription for Flexeril and instruction for light duty for two weeks (R. 210).

On September 6, 2005, Plaintiff saw Dr. Mace for follow up of his lower back and hip pain (R. 322). He said he had pain all the time with limited range of motion. Upon examination, Plaintiff had decreased range of motion of the lumbar spine with muscle spasm. He was diagnosed with acute lumbar muscle spasm and degenerative disc disease of the lumbar spine. Dr. Mace recommended Plaintiff decrease his weight, increase walking, and take Flexeril, hydrocodone, and Motrin.

On September 15, 2005, Dr. Weinstein wrote a letter to Dr. Mace, noting that Plaintiff had been working, but recently had to go off work because of the persistence of his symptoms (R. 231).

5

He advised that Plaintiff had a persistent left sciatica that now was worse. On examination, Plaintiff had a bilateral straight leg raising at about 30 degrees. Ankle jerks were decreased, but intact. There was no peripheral weakness. Dr. Weinstein also stated:

> I reviewed the patients [sic] latest MRI which was done on the 30th of August. The study shows a disc protrusion on the right at L4-5, but that is not so much of a concern as his symptoms are now on the left. There is a central disc protrusion of 5-1, which may be irritating the S1 nerve on the left. He has three degenerative discs 4-5, 3-4, and 5-1, and a relatively narrow canal.

Dr. Weinstein recommended a left S1 nerve block and a lumbar myelogram CT scan. He did not recommend major surgery because of Plaintiff's young age, but believed that if a nerve root was shown to be under compression, a small local operation might be helpful. On the other hand, if the nerve block worked, that would also solve his problem.

On September 20, 2005, Plaintiff presented to Dr. Mace for a follow up of his back pain (R. 321). He reported no improvement in pain and said he was out of pain medications. Upon examination he had muscle spasm and decreased range of motion of the lumbar spine. He was diagnosed with acute lumbar muscle spasm, degenerative disc disease of the lumbar spine, and hypertension. He was to take Motrin 800 mg, hydrocodone, and Flexeril and to start physical therapy.

On September 28, 2005, Plaintiff completed a Disability Report, stating the "illnesses, injuries, or conditions" that limited his abilities to work were: "Back injury from lifting pallet at work" (R. 114). Where asked how his illnesses, injuries or conditions limited his ability to work, he stated:

> I can't sit very long. I can't stand very long. The pain in my back and down my legs is severe most of the time. The medication that I am on doesn't allow me to do much because it makes me groggy. I can't bend over or lift any weight. If I try to lift

anything I end up in bed for a week or two unable to get up. It takes me 30 to 60 minutes everyday just to try and get out of bed.

(R. 114-115).

A flow sheet from February 2002 through August 2005, indicated Plaintiff's weight was 275 in February 2002, 269 in February 2003, 235 in September 2004, then back to the 270's by January 27, 2005 (R. 318). He appears to have gained 43 pounds between September 2004, and January 2005, eight months before his back injury and alleged onset date. He weighed 274 on August 9, 2005, before his on-the-job injury, and before his alleged onset date. On October 20, 2005, he weighed 280, on November 28, 2005, he weighed 284, and on January 30, 2006, he weighed 287.

On October 6, 2005, Plaintiff presented to physical therapy for evaluation (R. 314). The physical therapist opined that Plaintiff was expected to improve with physical therapy three times a week for four to eight weeks. Plaintiff cancelled his first two appointments, on October 10 and 11, due to his wife having surgery (R. 315).

On October 13, 17, 18, 20, 24, and 25, 2005, Plaintiff presented for physical therapy (R. 311, 313). Decrease in symptoms was noted after therapy, but extended relief was not yet obtained. He reported increased pain and a pins and needles sensation upon rising from bed on the 20th. He was to receive a pain injection. It was still noted that Plaintiff had increased range of motion and intermittent decrease in complaints.

Plaintiff had a pain injection on October 20, 2005, but said he had no improvement (R. 310). He also stated he had been to physical therapy four days. He was only getting three to four hours sleep at night due to discomfort. He continued to be diagnosed with acute lumbar muscle spasm and lumbar disc disease, and was prescribed hydrocodone and was to continue physical therapy.

7

Plaintiff did not appear for his physical therapy appointment on October 27, 2005, due to "other obligations" (R. 309). On October 31, he reported that his back was sore the day after his previous session. The therapist noted minimal muscle tightness in the lumbar area during treatment; no complaints with exercise; but minimal decrease in pain with treatment.

On November 1, 2005, Plaintiff complained of increased low back and hip pain, noting he had been in and out of his car a lot the evening before (R. 309). He did not exercise that day, and had no relief with other treatment.

Two days later, Plaintiff reported continued low back pain worse at night and in the morning (R. 308). He noted that his pain and stiffness decreased throughout the day and with physical therapy, but added that he did not think physical therapy would help long-term. The therapist noted Plaintiff demonstrated increased range of motion, but still limited. He felt Plaintiff would benefit from a pain clinic and discharged him from physical therapy.

On November 28, 2005, Plaintiff presented to Dr. Mace for a follow-up of his back, requesting an increase in pain medication (R. 307). He said his left leg went out from under him and he could not sleep well at night due to pain. He said that physical therapy helped for only one to two hours each visit. He was referred to the plain clinic.

A Residual Functional Capacity Assessment ("RFC") was completed by Porfirio Pascasio, a State agency medical consultant on December 5, 2005 (R. 218-225). He found Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand/walk about 6 hours in an 8-hour day; and could sit about 6 hours in an 8-hour day. He had no postural limitations. He found Plaintiff was partially credible.

On December 8, 2005, Plaintiff's application, based on Degenerative Disc Disease of the

Lumbar Spine and Obesity, was Denied (R. 31).

On December 29, 2005, Plaintiff presented to Dr. Mace for follow up (R. 304). He reported no improvement in his back pain. He also reported having a cold with fever. He was diagnosed with acute sinusitis and lumbar disc disease. He was prescribed Flexeril and antibiotics.

On January 5, 2006, Plaintiff filed his Request for Reconsideration (R. 49). Where asked his reasons for disagreeing with the Initial Decision, Plaintiff wrote: "The severity of my physical impairments prevent me from working at any full time employment." In his Disability Report, he stated that he took Flexeril, which made him lightheaded, and hydrocodone, which made him drowsy.

On January 19, 2006, Plaintiff underwent a lumbar myelogram, which showed central herniated disc and caudally migrated disc fragment at L3-4 and posterior osteophyte at L5-S1 without herniated disc (R. 273). Later that day, Plaintiff's wife called the hospital stating that Plaintiff was complaining of severe headache and chest pain (R. 277). The doctor explained that spinal headaches were possible, but could not explain the chest pains. He felt Plaintiff should go to the ER

On January 23, 2006, Plaintiff continued to complain of headache (R. 302). He was diagnosed with a post myelogram headache. He was treated with IV medications. He was discharged that same day with headache "almost relieved."

On January 30, 2006, Plaintiff presented to Dr. Mace for follow-up (R. 301). He stated his back was the same, and that he had an appointment with Dr. Weinstein for a nerve block.

On February 21, 2006, Plaintiff underwent a nerve root injection for pain in his left hip (R. 268).

9

On March 1, 2006, Plaintiff reported the injection helped for three days (R. 299). He was to go back in two weeks. He was diagnosed with lumbar disc disease and hypertension.

On March 8, 2006, Dr. Weinstein wrote to Dr. Mace, stating that Plaintiff's back was not hurting as much as it was, but he still had some symptoms, primarily into the left lower extremity (R. 230). His nerve block worked just for a few days, and the doctor was inclined to do it again. Dr. Weinstein reviewed the myelogram/CT scan, and noted:

> [A]lthough there is some modest pathology at 3-4, it's not enough, at his age, for me to recommend surgery. He would otherwise be left with severe scar tissue, if he happened to be a person that would be predisposed to forming scar tissue, and this, in the long run, might be as much, if not more of a problem than what he has.

On March 31, 2006, State agency reviewing physician Fulvio Franyutti, MD, completed an RFC, finding that Plaintiff could lift 50 pounds occasionally, 25 pounds frequently, could stand/walk about 6 hours in an 8-hour workday, and could sit about 6 hours in an 8-hour workday (R. 233-240). He could occasionally climb ladders, ropes, and scaffolds; stoop; kneel; crouch; and crawl. He should avoid concentrated exposure to temperature extremes. Dr. Franyutti found Plaintiff was partially credible, and opined Plaintiff's RFC was reduced to medium due to pain, obesity, and fatigue.

On April 3, 2006, Plaintiff presented to Dr. Mace, stating that, one month after his nerve block, the pain was back, "worse than ever" (R. 297). He could not lift anything without his back hurting.

On April 4, 2006, Plaintiff's application was denied at the Reconsideration level (R. 30). The denial was based on Spinal Disc Disorders (Discogenic/Degenerative), with notation that there was no established medical evidence of a secondary diagnosis.

On April 6, 2006, Plaintiff underwent a medical examination by Prasadarao Mukkamala, M.D. at the request of counsel for his employer (R. 241). Plaintiff was taking hydrocodone and Flexeril, and had gone to physical therapy three times a week for about 1 ½ months, which did not help. He later said it helped temporarily. He also had a nerve block which helped for only one or two days. Plaintiff said he continued to have pain in his low back radiating into the left leg all the way to the ankle.

Upon examination, SI joint maneuvers were painful on both sides (R. 244). Motor examination was mostly normal, with giveaway weakness in the left leg. Deep tendon reflexes were normal. Sensory examination was normal. His legs were the same length and circumference. Straight leg raising in the sitting position was negative to 90 degrees on the right side with no pain, and to 70 degrees on the left side with complaints of pain. Supine straight leg raising was positive at only 15 degrees on the right and 6 degrees on the left with complaints of back pain. Babinski was flexor on both sides and there was no ankle clonus. Examination revealed no scoliosis, no paraspinal muscle spam. There was bilateral lumbar paraspinal muscle tenderness and tenderness over the SI joint on both sides and in the midline vertebra.

Lumbar spine flexion was 32 degrees, extension was 16 degrees, right lateral flexion was 15 degrees, and left lateral flexion was 15 degrees. Plaintiff met the validity criteria. Plaintiff was able to ambulate independently and walked with a limp on the left side. He was unable to walk on his toes and heels and was unable to squat.

Dr. Mukkamala diagnosed lumbar sprain. He concluded that plaintiff had reached maximum medical improvement from his work-related injury. Dr. Mukkamala also concluded that Plaintiff did not require any further treatment. Even though he reported symptoms, there was no clinical

objective evidence of radiculopathy. Therefore, Dr. Mukkamala opined Plaintiff did not require any further treatment other than a home exercise program. Even though he found Plaintiff's continued symptoms were the result of degenerative disc disease, and not the work injury, he nevertheless wrote:

> Regardless of the etiology of the degenerative disc disease, the claimant does not require any further treatment. There was no indication for injections. Once again, the claimant has degenerative disc disease but the best course of treatment for that would be for the claimant to function the best he could and to continue with a home exercise program. There is no indication for injections.

An April 25, 2006, MRI showed central L3 herniated sic with causally migrated disc fragment and possible descending left L4 nerve root impingement, and mild bulge or small central focal disc herniation at L4-5 and central disc herniation L5-S1 without definite nerve root impingement (R. 266).

Plaintiff presented to neurologist Dr. Weinstein again on May 1, 2006, still complaining of symptoms into his left lower leg (R. 446). Dr. Weinstein noted the MRI showed a central disc herniation at L3, with a slight caudal migration of a disc fragment, and possibly a left L4 nerve impingement. He agreed there was indication for a nerve block at L4 on the left. He opined: "However, the pathology is not severe enough at his age to recommend surgery, which I think in the long run would be less helpful than doing something. Obviously, if the pathology gets worse, I would reconsider."

Plaintiff filed his request for Hearing by Administrative Law Judge on May 2, 2006 (R. 40). On his Disability Report he stated he had gotten worse, stating he had to "lay around more, unable to move around a lot due to lower back pain" (R. 163). He said he was taking hydrocodone which made him drowsy and Flexeril which made him lightheaded.

12

On May 16, 2006, Plaintiff's treating physician, Robert J, Crow, completed a "Verification of Temporary Total Disability" for the Workers' Compensation department (R. 258). In it, he marked that Plaintiff was temporarily and totally disabled due to lumbar disc disease; that he had reached maximum medical improvement; and that he anticipated permanent impairment as a result of the compensable injury.

A flow sheet dated May 16, 2006, showed Plaintiff weighed 293 pounds that date (R. 298).

The next day, Dr. Mace wrote a work-excuse note for Plaintiff, requesting leave from work until July 3, 2006 (R. 265).

On June 14, 2006, Plaintiff presented to the hospital with complaints of elbow pain after falling when his leg gave out (R. 291). Elbow x-rays showed no abnormality.

On June 21, 2006, Plaintiff underwent a nerve root injection with immediate improvement (R. 264).

On June 22, 2006, Dr. Mace completed a form for the State Department of Health and Human Services, stating that Plaintiff had back pain; that he could not lift; and that he could not drive if taking pain medications (R. 281). He described his pain as low back pain present constantly. His diagnosis was lumbar disc disease. The doctor opined Plaintiff would be unable to work at any full time work due to "too much pain to work." He should avoid "all" work situations. His inability to work would last one year. He believed Plaintiff should not be referred for vocational rehabilitation.

On July 3, 2006, Plaintiff presented to Dr. Mace, stating that he had some relief from the nerve block 11 days earlier (R. 288). His weight was 289 pounds (R. 287). He was taking Flexeril and hydrocodone (R. 286).

On July 12, 2006, the State Department of Health and Human Resources ("DHHS") found Plaintiff Incapacitated, finding he met or equaled the listing of impairments (R. 501).

On July 25, 2006, Plaintiff presented to his regular practitioner for follow up of his back pain (R. 444). Upon examination, he changed positions with difficulty, and had decreased range of motion. He was diagnosed with lumbar disc disease, and was prescribed a TENS Unit.

Plaintiff received a nerve block injection on July 27, 2006, which neurologist Dr. Weinstein observed "seemed to give him some reasonable relief, although he still has some back symptoms" (R. 445). He did not recommend surgery, "at least for now," noting he could do another nerve block if necessary. Dr. Weinstein told Plaintiff he "wanted him to do some walking, swimming, and isometric exercises to strengthen his back," stating: ""He does have a problem but these things sometimes just fade away in time. The disc can sometimes can [sic] reabsorb to a degree, and he can accommodate for the modest pathology as another approach."

On October 5, 2006, Plaintiff presented to Dr. Mace for follow up of his back injury (R. 443). He said the TENS Unit was helping. He had had two injections, but could only have three in six months. Upon examination, he changed position with difficulty and had decreased range of motion of the lumbar spine. The diagnosis was lumbar disc disease and hypertension. He was prescribed hydrocodone.

On December 13, 2006, Plaintiff presented to Dr. Mace for followup of chronic problems (R. 442). He complained of continued back pain. His blood sugar was high, and it was noted he did not get enough exercise. He was diagnosed with lumbar disc disorder and hypertension, and was prescribed hydrocodone and robaxin.

On January 7, 2007, Plaintiff presented to the ER with complaints of chest pain (R. 437).

He was found lying on the floor at home complaining of chest pain on a scale of 9 out of 10. At the hospital the pain was 5-6. Plaintiff said he had gotten up to get a drink and passed out. Plaintiff was sweaty, with erratic breathing and shortness of breath. He was transported by ambulance. Chest x-ray was normal with no evidence of acute disease. Plaintiff was discharged the next day with diagnoses of rule-out myocardial infarction, chest pain, and chronic pain syndrome. His discharge medications were Lortab and Flexeril and aspirin.

On January 17, 2007, Plaintiff was examined by A. E. Landis, M.D. upon referral by his workers' compensation insurer (R. 416). Plaintiff told Dr. Landis he had pain in his lower back radiating into his left leg, all the way to the ankle. The pain was continuous. He also had numbness in the left leg, which had caused him to fall eight to ten times. His symptoms increased with any increased activity, prolonged sitting, prolonged standing, walking, bending, lifting, or laying down too long. Rest, heat, and a TENS Unit helped to some extent. He was currently taking Lortab 10mgs. three times per day and Flexeril three times a day. He was not taking any anti-inflammatory medications. He did some stretching exercises in the morning. He did not wear a brace or back support.

Upon examination, Plaintiff was alert and in no distress. He was 6 feet tall and weighed 290 pounds, which Dr. Landis considered moderately obese. He had no obvious limp. He was able to undress and dress without any assistance. He was able to get on and off the examining table without any difficulty. Range of motion measurements using the dual inclinometer techniques resulted in invalid range of motion measurements. He had significant pain causing voluntary guarding and restriction. He did not meet the measurement criteria for impairment rating. He had no radicular pain on range of motion testing. There was no spasm of the paravertebral muscles. There was

tenderness to very light touch to the skin surface at L3-4, L4-5, and L5-S1 in the midline without any associated findings to explain this degree of tenderness. He also had tenderness to very light touch of the skin over the left paravertebral muscles and left sacroiliac joint. Heel and toe walking were "actually done without difficulty." Straight leg raising in the sitting position to 90 degrees caused low back pain bilaterally without any true sciatic radiation. He did have some left hip pain on straight leg raising on the left side. Straight leg raising supine to 30 degrees on the left and 40 on the right also caused low back pain bilaterally without any true sciatic radiation.

Neurologic exam showed no motor weakness or muscle atrophy. Thighs and calves were symmetrical. Sensory exam revealed decreased sensation over the lateral aspect of the left leg in a non-dermatome pattern. Deep tendon reflexes were 2+ and equal and ankle jerks were 2+ and equal. Leg lengths were equal.

X-rays showed no scoliosis. They did show degenerative disc space narrowing at L3-4, L4-5, and L5-S1. There was minimal anterior lipping at L4 and L5. Pars interarticularis was intact at all levels. There were facet changes at L5-S1 with mild lipping at L4and L5. MRI from August 2005 (not his most recent) showed moderate degenerative disc changes at L3-4, L4-5, and L5-S1 with bulging most pronounced at L4-5.

Dr. Landis opined that Plaintiff sustained a strain/sprain type injury to his lower back in the work-related incident, obviously superimposed on pre-existing advanced degenerative disc disease with history of multiple disc herniations prior to injury. "He obviously has reached maximum degree of medical improvement from the soft tissue injury/strain/sprain injury that he sustained in the instant claim. He does not need any additional treatment regarding the injury in this claim though he requires ongoing treatment for his chronic degenerative disc disease, disc protrusions, etc., which

pre-dated the injury." He was no longer temporarily totally disabled as a result of the injury. Dr.

Landis also found:

> Based on the A.M.A. Guides to Impairment Rating, Fourth Edition, claimant's range of motion measurements do not pass the validity criteria and therefore, cannot be used to assess impairment. His impairment related to the injury in this claim would be determined from Table 75, Category II-B for which he receives a 5 per cent impairment rating . . . . Claimnt's impairment, therefore, as a result of this soft tissue injury to this lower back in this claim, would be 5 per cent, even though he has significantly more impairment related to pre-existing advanced degenerative disc disease, disc herniations, etc. Claimnt's condition is not expected to be progressive. He does not require rehabilitation services.

On January 26, 2007, Plaintiff underwent an echocardiogram performed by S. M. Reddy, M.D. due to syncope and left arm pain (R. 428). The technical quality of the test was reported to be "fair." Plaintiff also underwent a nuclear myocardial perfusion scan that was negative (R. 481). Plaintiff's risk factors included hypercholesterolemia not on medication, chewing tobacco, and a "very sedentary lifestyle" (R. 430). He said he had gained 50 pounds in the last year.[1] He had chronic back problems. "Because of that he is disabled and does not do much activity." He complained of dyspnea on exertion, more lately, he attributed to his weight gain. He was taking hydrocortisone, Flexeril and aspirin.

Upon examination, Plaintiff weighed 297 pounds, described by Dr. Reddy as morbidly obese (R. 431). His blood pressure was 130/76, and pulse was 78.

Dr. Reddy diagnosed Plaintiff with syncope that happened while standing, "[s]ounds like classical drop in blood pressure, vasodepressor syncope;" ECG was abnormal; Atypical chest pain; History of hypercholesterolemia, on diet alone; History of chronic back problem with very sedentary

---

[1]The record shows Plaintiff weighed 287 in January 2006, and 289 in February 2007 (R. 496).

lifestyle; Exogenous obesity – "He gained 50 pounds in the last one year;" Very sedentary lifestyle; History of chronic tobacco use; Distant family history of coronary artery disease. Dr. Reddy stated he talked to Plaintiff "at length," telling him he needed to change his lifestyle. He told him to lose weight, which might help his back problem and arthritis. He was also considering more tests to rule out coronary artery disease. He told Plaintiff to "go on a good diet," and to get his cholesterol checked. If it was high, he might have to go on medication for that.

On February 20, 2007, Plaintiff presented to Dr. Mace for follow up of his visit with Dr. Reddy (R. 489). His doctor noted that Dr. Reddy believed Plaintiff's chest pain was "atypical." He was diagnosed with lumbar disc disease and as overweight. He was prescribed Kadian (hydromorphone).

On May 2, 2007, Plaintiff followed up with Dr. Mace for his chronic back pain (R. 490). Plaintiff said his legs were numb, causing falling. He was diagnosed with lumbar disc disease and overweight.

On May 17, 2007, Plaintiff underwent a Psychological Evaluation, on referral by his attorney "for psychological evaluation to assist with his Social Security disability claim" (R. 468). His appearance was neat and his hygiene was good. His chief complaint was that he "just can't do anything, lift anything with weights." He was "experiencing anhedonia, described as a loss of pleasure in enjoying family times, sitting on bleachers at his children's games, hunting, fishing, yard work and planting a garden." His appetite was fine, although he felt he ate too much and experienced a weight gain of at least 50 pounds.[2] He was now trying to eat only one meal a day, "as

_____

[2]The record shows Plaintiff weighed 271 pounds at the time of his work injury, 289 in February 2007, and 290 in July 2007.

18

he is unable to exercise to reduce weight." He was experiencing problems sleeping, getting only about 3-4 hours sleep a night, and only if he slept in a recliner. He was experiencing problems with his gait and was unable to get out a frequently as before. He said his energy level was very low, rating it as a 2-3 on scale of 10. He was experiencing feelings of "what he described as 'blah," worthlessness, guilt about not being able to help with family responsibilities and being present to his children." He felt his concentration was fair, but often found himself "worrying about bills, or how he is going to transport his children for their activities." His wife was a homemaker and they had four children, aged 11 - 13 (R. 471). He enjoyed attending their sport activities, and enjoyed sitting in his chair on the porch to relax. He also enjoyed watching TV and reading. Occasionally the family attended church together.

The psychologist reported that Plaintiff was "presently experiencing numbness in his legs that cause him to fall and is likely a result of his pinched nerve that necessitates walking with aide." He also described "currently experiencing occasional nervousness and irritability when he worries; possible panic attacks; fatigue; anxiety; loneliness; headaches approximately 4-5 times per week; low sexual frequency and desire; low self-esteem; difficulty relating; and he feels as if he has let his family down because of his poor health."

Plaintiff reported taking hydrocodone and morphine for pain, and Flexeril and robaxin for muscle relaxers.

Plaintiff denied any history of mental health problems (R. 471).

On Mental Status Examination Plaintiff appeared on time driven by his father-in-law (R. 472). His appearance was neat and hygiene was good. There was some evidence of psychomotor agitation or disturbance. He had a slow gait with rigid posture. When nervous he shook his right

leg and rose from his chair often to stretch.  His interpersonal interaction was good.  He seemed comfortable and relaxed and his eye contact was good.  He described his mood as "blah," down and blue.  His affect was restricted.  His speech was normal.  He denied ever having any suicidal ideations or plans.  There was no evidence of abnormal thinking, hallucinations, or delusions.  He was fearful of heights.  He was well-oriented to time, place, person and circumstance.  Immediate, recent, and long-term memory were all unimpaired.  Plaintiff reported having some problems concentrating and could not stay focused, due to his physical conditions.  Concentration was measured as moderately deficient.  His judgment was intact and his intelligence appeared average. His insight was fair, including that he was seeking social security disability, and that most of his health problems and behavioral health problems stemmed from accidents at his place of work.  The psychologist noted that Plaintiff was cooperative and a good historian.  Plaintiff often commented that he did not know an answer, but would proceed to give good answers to the questions.

Plaintiff's reported daily activities were waking at 7:00 a.m. but taking 45 minutes to get out of bed (R. 473).  He helped get his children off to school while his wife fixed breakfast.  After breakfast he sat in his recliner and took his medications.  He received a tens-unit treatment and wore the unit throughout the morning.  He watched TV and read, perhaps napping throughout the morning. At noontime he ate lunch with his wife and spent the afternoon at home.  When his children came home from school he supervised their chores and homework.  After dinner, he took a walk to his in-laws to visit occasionally.  He spent most evenings watching TV and went to bed about 11:00 p.m.

IQ testing showed Plaintiff's Full Scale IQ as 80, at the low average range (R. 473).  The psychologist noted that his affect and/or motivation difficulties may have affected his performance, which may warrant caution in the interpretation of his scores.  Achievement testing showed Plaintiff

read at the 8th grade level, spelled at the 6th grade level, and performed math at the 5th grade level. Personality testing was considered valid (R. 476). His primary problems appeared to be physical concerns and depressed mood. He felt nervous, tense, and unhappy, and was currently quite worried. He appeared to be quite indifferent to many of the things he once enjoyed and believed he was no longer able to function well in life. He was overly sensitive to criticism, tended to blame himself a great deal, and felt that he had not been treated well. His depressed mood was accompanied by physical complaints and extreme fatigue.

The psychologist opined that Plaintiff appeared to be inhibited and over-controlled, relying on denial and repression to deal with anxiety and conflict. "He may seek medical attention for his 'run down' condition, but his physical problems are likely to be related to his depressed mood. Notably, the items he endorsed "suggest a poor memory, concentration problems, and an inability to make decisions. " He viewed his physical health as failing and reported numerous somatic concerns. He was likely to have cognitive problems and low intellectual efficiency, has a great vulnerability to stress and is tense, apprehensive, fearful and phobic. "Many individuals with his profile experience back and chest pains cardiac complaints and unemployability."

The psychologist opined: "The most frequent diagnosis for individuals with this profile type is Dysthymic Disorder. Physically disabling conditions related to psychological stress, such as ulcers or hypertension, may be part of the clinical pattern."

The psychologists' mental diagnostic impression was Major Depressive Disorder, Recurrent, severe without psychotic features, and Pain Disorder associated with both psychological factors and

a general medical condition. His GAF was listed as 50.[3]

The psychologist opined that Plaintiff showed a moderate impairment in social functioning. "Because he feels so inadequate, worthless and hopeless he tends to isolate from previous friendships and primarily associates with family members. While he has some friends he does not see them often as he is unable to participate in activities such as fishing and hunting due to his physical condition which has diminished his relationships with peers."

Regarding concentration, persistence and pace, the psychologist opined that Plaintiff had difficulty managing routine affairs, and the items he endorsed on the personality test suggested poor memory, concentration problems, and an inability to make decisions. He appeared to be immobilized and withdrawn and had no energy for life which would greatly affect his persistence and pace. His slow processing speed may make the task of comprehending novel information more time-consuming and difficult for him.

Regarding Decompensation, the psychologist opined that Plaintiff felt "intensely fearful about a large number of objects and activities. This hypersensitivity and fearfulness appear to be generalized at this point and may be debilitating to him in social and work situations. He is very vulnerable to stress and anxiety such that he would likely find it difficult at this time to cope in any social setting, or work setting due to his present level of emotional and psychological stress. Given a normal stressful event Mr. Cogar is likely to experience exacerbation of his depression and anxiety and somatic complaints."

---

[3]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

The psychologist completed a Psychiatric Review Technique form ("PRT") opining that Plaintiff met Listing 12.04 for affective disorders and 12.07 for somatoform disorders (R. 447). Somatoform Disorder was defined as:

> Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms, as evidenced by at least one of the following:
>
> A history of multiple physical symptoms of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly . . . .

The psychologist opined that Plaintiff would have moderate restriction of activities of daily living and maintaining social functioning. He would have marked difficulties in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration (R. 457).

The psychologist also completed a Mental Residual Functional Capacity Assessment ("MRFC"), finding Plaintiff would have an "extreme limitation in his ability to tolerate ordinary work stress." He would have "marked" limitations in his ability to respond to changes in the work setting or work processes; traveling independently in unfamiliar places; and maintaining regular attendance and punctuality. He would have moderate limitations in his ability to understand and remember and carry out detailed instructions; exercise judgment or make simple work-related decisions; sustain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychological symptoms and performing at a consistent pace without an unreasonable number and length of work breaks; working in coordination with others without unduly distracting them; relating predictably in social situations in the workplace without exhibiting behavioral extremes; and ability to be aware of normal hazards and take appropriate

precautions. He was mildly impaired in his ability to understand and remember and carry out short, simple instructions; interact appropriately with the public; respond appropriately to direction and criticism from supervisors; maintain acceptable standards of grooming and hygiene; maintain acceptable standards of courtesy and behavior; ability to ask simple questions or request assistance from coworkers or supervisors; carry out an ordinary work routine without special supervision; and setting realistic goals and making plans independently of others.

On June 13, 2007, Rehabilitation Counselor Robert Jackson, who acted as the Vocational Expert ("VE") at the Administrative Hearing submitted DOT numbers for sedentary unskilled general production workers and material handlers to the ALJ to pass on to counsel (R. 491).

On July 10, 2007, Plaintiff presented to a new hospital clinic with a chief complain of "knot on top of head, has ruptured discs in back" (R. 510). He blood sugar fluctuated and he had a back injury in 2005, so he had a weight gain of 60 pounds over the last two years because he could not exercise due to back pain. He also complained of the knot on his head that he had had since a motor vehicle accident in 1989– "been there ever since"– that was tender.

Upon examination, he had lumbar pain, and a lipoma of the scalp. He was tender to palpation at the mid lumbar area with limited range of motion due to "pain [with] certain movements" He was diagnosed with low back pain, hypertension, and a lipoma of the scalp.

On July 17, 2007, Plaintiff presented to the clinic for sinus pain and pressure for five to six days, taking Claritin which helped some (R. 514). He was diagnosed with allergic rhinitis, low back pain, and hyperlipidemia.

On or about July 31, 2007, Dr. Mace completed a form for the State DHHS, stating that Plaintiff had diagnoses of lumbar disc disease and overweight, and that his prognosis was fair (R.

495). He opined that Plaintiff could not do any work, and his disability was expected to last one year. A flow sheet attached to the form showed Plaintiff weighed 271 in August 2005, and 290 on July 31, 2007 (R. 496). He was taking Kadian 30 mg twice a day, and Flexeril 10 mg as needed (R. 497).

On September 24, 2007, Plaintiff presented to the clinic complaining of ruptured discs in his lower back since 1989 (R. 516). He had a nerve block six months earlier by Dr. Weinstein. On Friday the pain got worse and he had pain and numbness in his legs. He received a Demerol shot. Examination showed pain with palpation of the lower back. Plaintiff appeared restless, unable to stay in one position. He needed a medication refill, and was interested in a second opinion, because Dr. Weinstein felt he was too young for surgery, but he was looking for some type of treatment. The assessment was chronic back pain. Plaintiff was prescribed Lortab, Lodine, Toradol and Flexeril.

### III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since August 22, 2005, the alleged disability onset date (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: degenerative disc disease of the lumbosacral spine, obesity, and a combination of major depressive disorder and a somatoform disorder (20 CFR § 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the requirements of any of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform simple, unskilled sedentary work that requires a sit/stand option.

6.    The claimant is unable to perform any past relevant work (20 CFR § 404.1565).

7.    The claimant was born on July 29, 1970, and was 35 years old, which is defined as a younger individual age 18-44 on the alleged disability onset date. (20 CFR § 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR § 404.1564).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable jobs skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).

11.   The claimant has not been under a "disability," as defined in the Social Security Act, from August 22, 2005, through the date of this decision. (20 CFR 404.1520(g)).

(R. 17-29).

## IV. DISCUSSION

### A. Contentions of the Parties

Plaintiff contends:

1.    The ALJ found severe impairments of major depressive disorder and somatoform disorder, but failed to include any mental limitations from these in his hypothetical RFC to the Vocational Expert and rejected the only psychological assessment of record.

2.    The ALJ's step two credibility analysis was faulty when he failed to evaluate

adequately and make a finding regarding side effects of Robert's prescribed medications.

Defendant contends:

1. The ALJ accommodated Plaintiff's mental impairment when he included in the hypothetical question a limitation to simple, unskilled work.

2. The ALJ . . . correctly considered [Defendant's] subjective complaints in accordance with the regulations . . . .

## B. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## C. Mental Impairments

Plaintiff first argues: "The ALJ found severe impairments of major depressive disorder and somatoform disorder, but failed to include any mental limitations from these in his hypothetical RFC to the Vocational Expert and rejected the only psychological assessment of record." Defendant contends: "The ALJ accommodated Plaintiff's mental impairment when he included in the hypothetical question a limitation to simple, unskilled work."

The ALJ did find that Plaintiff had "a combination of major depressive disorder and a somatoform disorder" (R. 20). The ALJ then noted Plaintiff's own testimony that he took no medication for nerves and had never received even a suggestion from any health care provider that he needed mental health treatment (R. 21, 553). The ALJ then found Plaintiff had mild restriction of activities of daily living; mild difficulties in social functioning; moderate difficulties with concentration, persistence or pace; and had experienced no episodes of decompensation.

As to daily activities, the ALJ expressly found that in October 2005, Plaintiff participated in physical therapy, left home to see his doctor, sometimes went to the post office, and occasionally went to the grocery story; at home, he watched television, sat on the porch, and attempted to do exercises from a prescribed home exercise program. He could take care of his own personal care, except for bending over to put on shoes, tie them, and put on jeans and a shirt. He could shower, although he was unable to get in and out of a bathtub. He found it hard to sit down on and get up off a toilet. He prepared his own sandwiches and microwaved foods two to three times a week. He performed no household or yard work, but this was due to his physical limitations. He went outside 2-3 times a day; and he could ride in a car and drive short distances if he was not in pain or taking

prescription medications. He could no longer hunt or fish, but could watch television or read for about two-three hours a day. He could no longer go outside to play with his children. He testified that he only got about three- four hours of sleep due to pain, and that during the day he would lie down on a recliner, use a TENS unit for his back, and lie back and get a little rest.

Regarding social functioning, the ALJ noted that Plaintiff reported that he spent time with others by walking next door to visit with his in-laws three or four times a week; he regularly went to physical therapy and to his doctor; he had no trouble getting along with family, friends, neighbors or others; but he could not get out to the places in general as he once did.

With regard to concentration, persistence or pace, the ALJ explained that Plaintiff reported trouble sleeping and the pain medications making him groggy. However, Plaintiff also reported that he was able to pay bills, count change, handle a savings account, and use a checkbook/money orders. He said he had a limited attention span due to pain medications, but he finished what he started. He could follow oral and written instructions very well. He said he handled stress all right, but he did not handle changes in routine well.

Regarding episodes of decompensation, as already noted, the ALJ determined Plaintiff had had none.

As the ALJ found, the undersigned also finds that most of these limitations are based on Plaintiff's physical impairments, and not on mental impairments.

Plaintiff argues that the ALJ erred by rejecting the only psychological assessment of record. The ALJ noted he gave no more than slight weight to the psychologists' opinion because theirs is the only report of work-related functional limitations from mental impairments. Plaintiff argues that the fact this was the only mental health opinion should make it more, not less, reliable. The reason

it is the only psychological assessment of record, however, is that, as the ALJ notes, Plaintiff never went to any mental health provider; never named any mental health impairment in any of his submissions to the Commissioner; and never complained of mental health problems to his treating physicians. He was not prescribed any medication for depression or anxiety by any health care provider, nor did any physician refer him to a mental health care provider for evaluation or treatment. His first and only evaluation for a mental impairment was in May 2007, more than a year and a half after he applied for disability, and only a month before his Administrative Hearing. That first and only psychological evaluation was performed at the request of Plaintiff's counsel, "for psychological evaluation to assist with his Social Security disability claim." In other words, he did not go to the psychologists to seek treatment. Significantly, even after that evaluation and rather serious diagnosis, Plaintiff still did not go to any mental health provider nor did he receive any treatment or receive any medications for nerves or depression from any of his regular health care providers.

Significantly, even at the psychological evaluation, Plaintiff denied any history of mental health problems (R. 471). The psychologists found Plaintiff's appearance was neat and his hygiene was good. His chief complaint was that he "just can't do anything, lift anything with weight," in other words, a physical complaint. He did report "experiencing anhedonia, described as a loss of pleasure in enjoying family times, sitting on bleachers at his children's games, hunting, fishing, yard work and planting a garden," but again, the loss of these activities was due mostly to his physical problems. His appetite was fine, although he felt he ate too much and experienced a weight gain of at least 50 pounds. He was experiencing problems sleeping, getting only about 3-4 hours sleep a night, and only if he slept in a recliner, again, due to pain. He was experiencing problems with his gait and was unable to get out as frequently as before, again, due to pain.

Regarding symptoms more generally due to mental problems, Plaintiff said his energy level was very low, rating it as a 2-3 on scale of 10. He was experiencing feelings of "what he described as 'blah,' worthlessness, guilt about not being able to help with family responsibilities and being present to his children." He felt his concentration was fair, but often found himself "worrying about bills, or how he is going to transport his children for their activities." His wife was a homemaker and they had four children, aged 11 - 13 (R. 471). He enjoyed attending their sport activities, and enjoyed sitting in his chair on the porch to relax. He also enjoyed watching TV and reading. Occasionally the family attended church together. Plaintiff described "currently experiencing occasional nervousness and irritability when he worried; possible panic attacks; fatigue; anxiety; loneliness; headaches approximately 4-5 times per week; low sexual frequency and desire; low self-esteem; difficulty relating; and he feeling as if he has let his family down because of his poor health."

On Mental Status Examination Plaintiff's appearance was neat and his hygiene was good. He had a slow gait with rigid posture. When nervous he shook his right leg. He rose from his chair often to stretch. His interpersonal interaction was good. He seemed comfortable and relaxed and his eye contact was good. He described his mood as "blah," down and blue. His affect was restricted. His speech was normal. He denied ever having any suicidal ideations or plans. There was no evidence of abnormal thinking, hallucinations, or delusions. He was well-oriented to time, place, person and circumstance. Immediate, recent, and long-term memory were all unimpaired. Plaintiff reported having some problems concentrating and could not stay focused, due to his physical conditions. Concentration was measured as moderately deficient. His judgment was intact and his intelligence appeared average. His insight was fair, including that he was seeking social

security disability, and that most of his health problems and behavioral health problems stemmed from accidents at his place of work. The psychologist observed that Plaintiff was cooperative and a good historian, noting that although Plaintiff often commented that he did not know an answer, he then would proceed to give good answers to the questions.

Plaintiff's reported daily activities were waking at 7:00 a.m., but taking 45 minutes to get out of bed (R. 473). He helped get his children off to school while his wife fixed breakfast. After breakfast he sat in his recliner and took his medications. He wore a TENS unit throughout the morning. He watched TV and read, perhaps napping throughout the morning. At noontime he ate lunch with his wife and spent the afternoon at home. When his children came home from school he supervised their chores and homework. After dinner, he took a walk to his in-laws to visit occasionally. He spent most evenings watching TV and went to bed about 11:00 p.m.

The psychologists found Plaintiff's primary problems appeared to be physical concerns and depressed mood.

The psychologists' mental diagnostic impression was Major Depressive Disorder, Recurrent, severe without psychotic features, and Pain Disorder associated with both psychological factors and a general medical condition. His GAF was listed as 50.[4]

The psychologist opined that Plaintiff showed a moderate impairment in social functioning. "Because he feels so inadequate, worthless and hopeless he tends to isolate from previous friendships and primarily associates with family members. While he has some friends he does not see them

.

---

[4]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

often as he is unable to participate in activities such as fishing and hunting due to his physical condition which has diminished his relationships with peers." Again, he does not see his friends as often "due to his physical condition." In the Mental Status Examination, on the other hand, the psychologists found Plaintiff's interpersonal interaction was good, and he seemed comfortable and relaxed and his eye contact was good.

Regarding concentration, persistence and pace, the psychologist opined that Plaintiff had difficulty managing routine affairs, and the items he endorsed on the personality test suggested poor memory, concentration problems, and an inability to make decisions. He appeared to be immobilized and withdrawn and had no energy for life which would greatly affect his persistence and pace. His slow processing speed may make the task of comprehending novel information more time-consuming and difficult for him. The undersigned finds these opinions inconsistent with the findings of the psychologists during the Mental Status Examination, which indicated Plaintiff was well-oriented to time, place, person and circumstance; immediate, recent, and long-term memory were all unimpaired; and he had "some" problems concentrating and could not stay focused, but these were due to his physical conditions. Concentration was measured as moderately deficient. His judgment was intact and his intelligence appeared average. His insight was fair, including that he was seeking social security disability, and that most of his health problems and behavioral health problems stemmed from accidents at his place of work. The psychologist noted that Plaintiff was cooperative and a good historian, especially noting that Plaintiff often commented that he did not know an answer, but then would proceed to give good answers to the questions.

Regarding Decompensation, the psychologist opined that Plaintiff felt "intensely fearful about a large number of objects and activities. This hypersensitivity and fearfulness appear to be

generalized at this point and may be debilitating to him in social and work situations. He is very vulnerable to stress and anxiety such that he would likely find it difficult at this time to cope in any social setting, or work setting due to his present level of emotional and psychological stress. Given a normal stressful event Mr. Cogar is likely to experience exacerbation of his depression and anxiety and somatic complaints." Again, this opinion seems inconsistent with Plaintiff's own statements, his activities, and the lack of any evaluation or treatment for mental impairments. In fact, the undersigned finds there is absolutely no evidence Plaintiff experienced "repeated episodes of decompensation, each of extended duration," meaning three episodes within one year, or an average of once every four months, each lasting for at least two weeks.

The psychologist completed a Psychiatric Review Technique form ("PRT") opining that Plaintiff met Listing 12.04 for affective disorders and 12.07 for somatoform disorders (R. 447). Somatoform Disorder was defined as:

> Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms, as evidenced by at least one of the following:
>
> A history of multiple physical symptoms of several years duration beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly . . . .

The psychologist opined that Plaintiff would have moderate restriction of activities of daily living and maintaining social functioning. He would have marked difficulties in maintaining concentration, persistence, or pace, and had one or two episodes of decompensation, each of extended duration (R. 457). Again, the undersigned finds this opinion inconsistent with all the evidence of record, including Plaintiff's own statements, the psychologists' own first-hand observations of Plaintiff and the lack of even a referral for mental health evaluation or treatment.

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's according the psychologists' opinion slight weight; his determination that Plaintiff had a combination of major depressive disorder and a somatoform disorder; and his determination that these mental disorders would cause mild restriction in activities of daily living, mild difficulties in social functioning; moderate difficulties in concentration; and no episodes of decompensation.

Plaintiff also argues that, having found Plaintiff had severe mental impairments, he erred by failing to include any mental limitations from these in his hypothetical RFC to the Vocational Expert. The undersigned disagrees. The ALJ limited Plaintiff to work that was simple and unskilled. These limitations are not based on Plaintiff's exertional or physical non-exertional impairments, but are mental limitations. Plaintiff also argues that the ALJ erred by not including a limitation regarding "low-stress" work in his hypothetical. First, the psychologists did not diagnose Plaintiff with an anxiety disorder. Plaintiff himself told the psychologist he was "currently experiencing <u>occasional</u> nervousness and irritability <u>when he worried;</u> <u>possible</u> panic attacks; fatigue; and anxiety. At the start of the evaluation, something he had never before experienced, "he seemed comfortable and relaxed."

Finally, as already noted, the ALJ limited Plaintiff to "simple, unskilled work." Plaintiff argues that the jobs identified by the VE in response to the hypothetical all "<u>seem</u> to involve work functions or work situations traditionally viewed as high stress . . . ." (Emphasis added). First, only the examining psychologists opined that Plaintiff could not endure a high stress job. Even after that opinion, Plaintiff did not seek any further evaluation or treatment or medication. Significantly, the psychologists recommended therapy and antidepressant medication; yet there is no evidence in the record of his going to any therapist or requesting any medication from his family physician. In fact,

there is no mention of mental health issues to any doctor after this evaluation or even after the Administrative Hearing.

On July 10, 2007, Plaintiff presented to a new hospital clinic with a chief complain of "knot on top of head, has ruptured discs in back" (R. 510). He blood sugar fluctuated and he had a back injury in 2005, so he had a weight gain of 60 pounds over the last two years because he could not exercise due to back pain. He also complained of the knot on his head that he had had since a motor vehicle accident in 1989– "been there ever since"– that was tender. There was no mention of any anxiety, stress, or depression or any other mental health issue. Also, again, there is no evidence Plaintiff gained 60 pounds since his injury. He weighed 271 in September 2005, and 290 in July 2007.

On July 17, 2007, Plaintiff presented to the clinic for sinus pain and pressure for five to six days, taking Claritin which helped some (R. 514). He was diagnosed with allergic rhinitis, low back pain, and hyperlipidemia. Again, there is no mention of any mental health issues.

On or about July 31, 2007, Dr. Mace completed a form for the State DHHS, stating that Plaintiff had diagnoses of lumbar disc disease and overweight (R. 495). There was no diagnosis or mention of any mental health issue.

On September 24, 2007, Plaintiff presented to the clinic complaining of ruptured discs in his lower back since 1989 (R. 516). He had had a nerve block six months earlier by Dr. Weinstein. On Friday the pain got worse and he had pain and numbness in his legs. He received a Demerol shot. Examination showed pain with palpation of the lower back. Although it was noted that "Plaintiff appeared restless, unable to stay in one position," there is still no mention of a mental health issue of any kind.

Finally, through the date of the Appeals Council decision, in October 2008, Plaintiff still did not submit any evidence that he had sought any evaluation or treatment for mental health issues, and there is no mention of same in the records submitted to the Appeals Council.

Upon consideration of all which, the undersigned finds substantial evidence supports the ALJ's according only slight weight to the examining psychologists' opinion, and his determination regarding Plaintiff's mental impairments, including his finding that Plaintiff could perform "simple, unskilled" work despite these impairments.

### D. Side Effects of Medications

Plaintiff next argues: "The ALJ's step two credibility analysis was faulty when he failed to evaluate adequately and make a finding regarding side effects of Robert's prescribed medications."

The ALJ found that Plaintiff met the first, threshold, step under the regulations and case law, in that he had medically determinable impairments that could reasonably be expected to produce his pain. The ALJ was next required to consider "all the available evidence," including that listed in the second step of the evaluation, including the medical signs and laboratory findings, Plaintiff's own statements about his symptoms, any statements and other information provided by treating or examining physicians and other persons about the symptoms and how they affected Plaintiff, and any other relevant evidence in the case record. A review of the decision shows the ALJ did note Plaintiff's statements about his pain, his medical history, medical signs, and laboratory findings, objective medical evidence of pain, his daily activities, specific descriptions of the pain, and medical treatment taken to alleviate the pain. Pursuant to 20 CFR 404.1529(c), the ALJ must consider "[t]he type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms."

The ALJ noted that Plaintiff had, at the time of the hearing been taking Kadian and morphine for three months, and before that, he took hydrocodone and Flexeril. The ALJ also expressly noted that Plaintiff said that the hydrocodone and Flexeril caused dizziness, sleepiness, and lack of energy, and his current medications Kadian and morphine caused dizziness and "knocked him out a lot." Review of the record does not indicate that Plaintiff ever complained of these side effects to any of his doctors, however. He did not ask any doctor whether a change in the medications, dosages, or timing of the dosages may have alleviated these symptoms. Further, the DDS reviewing physicians knew of Plaintiff's taking hydrocodone and Flexeril, yet found him capable of performing medium work.

On June 22, 2006, Plaintiff's regular treating physician, Dr. Mace, submitted a form to the State DHHR, stating Plaintiff's Statement of Incapacity/Disability as: "Back pain – can't lift anything – can't drive if taking pain medication" (R. 281).

Plaintiff alleges his current medications cause him to be drowsy, sleepy, and disoriented, citing R. 134, R. 536-537, and R. 181. The documents cited by Plaintiff in support of his allegations regarding his medications are solely from his own statements on disability application forms or his testimony. Later in his brief, he states he "had reported at the time of filing his claim that 'The medication that I am on doesn't allow me to do much because it makes me groggy,' citing R. 155. He also stated he "reported repeatedly that his prescribed medications of Hydrocodone and Flexeril, and later Kadian and Robaxin [R. 537] made him feel 'groggy,' 'drowsy,' [R. 147, 166, 176] 'sleepy,' [R. 176], 'make me sleep' [R. 537], 'disoriented', affect 'concentration' [R. 158] and 'memory' [R. 158], 'light-headed' [R. 147, 166, 176], 'dizziness' [R. 537], 'can't drive when taking medication' [R. 145], 'no energy' [R. 537], 'knocks me out' [R. 537] 'I got to watch how I walk'

[R. 537]." Upon review of the records cited by Plaintiff, however, not one is from a medical record. All are from forms filled out by Plaintiff or from his own testimony. None are doctor's reports or even Plaintiff's own reports to doctors.

In Burns v. Barnhart, 312 F.3d 113 (3rd Cir. 2002), the Third Circuit considered the issue of side effects of medications. The court stated that the ALJ noted the record contained no significant complaints of side effects from medication. The Court also noted that there was no medical evidence as to any physical limitations resulting from any side effects from medication. The Court then held:

> Drowsiness often accompanies the taking of medication, and it should not be viewed
> as disabling unless the record references serious functional limitations. Here, there
> is no such evidence.

This sentence was quoted with approval in Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005). See also Turner v. Commissioner, 182 Fed. Appx. 946 (11th Cir. 2006)( "[T]he ALJ did not err in discrediting Turner's testimony regarding side-effects from her medications because the record includes no evidence that Turner consistently complained to her doctors of any side-effects"); Swindle v. Sullivan, 914 F.2d 222 (11th Cir. 1990)("Ms. Swindle also argues that the many medications she is taking have severe side effects that the ALJ failed to take into consideration. However, the ALJ noted that Ms. Swindle did not complain of side effects, with the exception that she felt that one medication might be giving her headaches, and the record did not disclose any concerns about side effects by the several doctors who examined and treated her.").

Plaintiff describes the "common side effects" of his medications, as found on various web sites (brief at 13). Again, although these may be "common side effect," there is no indication Plaintiff ever reported any of these to any doctor, or to the examining psychologists.

Plaintiff himself, in his application, stated he had a limited attention span due to medications

39

but finished what he started; could follow written instructions "very well;" could follow spoken instructions "very well;" got along with authority figures; could handle stress "all right;" but had difficulty with changes in routine (R. 137-144).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's finding regarding Plaintiff's credibility; his finding that Plaintiff retained the residual functional capacity to perform simple, unskilled sedentary work that requires a sit/stand option; his finding that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, and his ultimate conclusion that Plaintiff has not been under a "disability," as defined in the Social Security Act, from August 22, 2005, through the date of his Decision.

## V. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment [Docket Entry 11] be **GRANTED**, Plaintiff's Motion for Summary Judgment [Docket Entry 10] be **DENIED**, and this matter be **DISMISSED** from the Court's Docket.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _16_ day of November, 2009.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE